# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

**LUIS ANGEL HEREDIA CRESPI, LYNETTE DAVIS,** and **MARTIN FORERO,** individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

**BAYCARE HEALTH SYSTEM, INC.,** a nonprofit corporation organized under the laws of Florida,

*Defendant*

Case No.  8:25-cv-2245

**PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND**

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Luis Angel Heredia Crespi, Lynette Davis, and Martin Forero (collectively "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint against Defendant BayCare Health System, Inc. ("BayCare" or "Defendant"), and allege as follows:

## NATURE OF THE ACTION

1.      This is a class action lawsuit arising from BayCare's collection and disclosure of Website visitors' sensitive personal health information and electronic

communications to Google without prior notice and consent, through tracking mechanisms embedded in Defendant's website, www.baycare.org (the "Website")'.

2.      BayCare is a leading not-for-profit healthcare system across West Central Florida. Formed in 1997, BayCare is one of the largest employers in the Tampa Bay area, with nearly 33,000 employees, 16 hospitals, and hundreds of outpatient locations. Through its Website, BayCare allows visitors to search for physicians and various medical facilities, explore health services, pay for care, enter their patient portal, and register for support groups, courses, and other programs.

3.      Unbeknownst to Website visitors, BayCare has knowingly implemented two tracking technologies owned by Google on its Website: the Google Analytics 4 Tracker and the DoubleClick Tracker (collectively, the "Trackers"). When Website visitors search for doctors or medical specialists, research treatment locations, seek information about specific medical services or conditions, or interact with other health-related content, BayCare procures Google through the Trackers to intercept these electronic communications without consent. This includes the interception of: (a) the names, specialties, and locations of physicians from whom visitors are seeking treatment; (b) the medical facilities where visitors are seeking treatment; (c) the types of medical services or procedures

2

visitors are seeking; and (d) search queries entered by visitors into the Website's search bar.

4.    This interception of private electronic communications occurs without appropriate notice to visitors and without obtaining their consent, in violation of (1) the Florida Security of Communications Act, Florida Statutes § 934.01, *et seq.* ("FSCA"); (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511 et seq. ("ECPA"); (3) breach of confidence; (4) common law protections against invasion of privacy; (5) unjust enrichment; and (6) breach of implied contract.

5.    Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. Under the ECPA, similar protections exist at the federal level.

6.    Through this action, Plaintiffs seek to remedy these harms and bring causes of action to hold BayCare accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

## PARTIES

7.     Plaintiff Luis Angel Heredia Crespi is a natural person and citizen of Florida where he intends to remain.

8.     Plaintiff Lynette Davis is a natural person and citizen of Florida where she intends to remain.

9.     Plaintiff Martin Forero is a natural person and citizen of Florida where he intends to remain.

10.    Defendant BayCare Health System, Inc. is a Florida not-for-profit corporation and healthcare organization with its headquarters and principal place of business located at 2985 Drew Street, Clearwater, FL 33759. Defendant operates more than 500 medical facilities throughout Florida.

11.    Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d and 45 C.F.R. Parts 160-164.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs,

there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

13.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the ECPA (18 U.S.C. § 2511, *et seq.*).

14.    This Court has personal jurisdiction over Defendant because its principal place of business is in the Middle District of Florida, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

15.    Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

*i.    Overview of Website Tracking on Healthcare Websites*

16.    Many websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become

increasingly sophisticated, evolving from simple cookies to complex tracking systems that can monitor detailed user behavior across websites and devices.

17.   Website-tracking technologies typically function by placing small pieces of code on websites that are downloaded to a user's browser when they visit the site. This code enables the collection of various types of data about the user's interactions with the website, which is transmitted to third-party servers.

18.   The most basic form of website tracking involves cookies, which are small text files stored on a user's device that identify users and their browsing activity. First-party cookies are placed by the website the user is visiting directly, while third-party cookies are placed by domains other than the one the user is visiting. These third-party cookies enable tracking across multiple websites and are commonly used for advertising and analytics purposes.

19.   JavaScript-based trackers represent a more sophisticated tracking method. Website owners implement these trackers by embedding JavaScript code snippets into their website's source code. When a user loads a webpage containing such code, the tracker is downloaded onto the user's browser, where it activates and collects data about user behavior, which is then transmitted to the tracker provider's servers in real-time.

20.     The interception of healthcare-related communications through these tracking technologies is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

21.     As detailed in this Complaint, BayCare has implemented such tracking technologies on its Website, resulting in the unauthorized interception of visitors' electronic communications by Google.

*ii.     The Google Analytics Tracking Technology*

22.     Google LLC ("Google") is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, including Google Search, Gmail, YouTube, and Android, which it then leverages to deliver targeted advertisements.

23.     The Google Analytics 4 Tracker ("Google Analytics Tracker") is a web analytics service offered by Google that allows website owners to track visitors' actions on their website in order to gain insights into user behavior and to target

them with personalized advertisements. BayCare has implemented the Google Analytics Tracker on its Website.

24.    The Google Analytics Tracker is a JavaScript-based tracking technology developed by Google. Website owners or administrators implement the Tracker by adding a snippet of JavaScript code to their website. This implementation process is usually simple, requiring the website administrator to copy and paste the provided code into the website's source code.

25.    Once implemented, the Tracker loads automatically and immediately whenever a user visits a page containing the Tracker's source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms and the interception of their communications by Google. The surreptitious nature of the Tracker means that users typically have no idea that their electronic communications are being intercepted by third parties like Google.

26.    The Google Analytics Tracker intercepts and collects various data points about user interactions with a website, which it calls "events," and transmits details of these events to Google. These events include page views, clicks, form

submissions, video plays, file downloads, and custom events defined by the website owner.

27. When a user accesses BayCare's Website while logged into a Google Chrome browser or signed into their Google Account (such as Gmail or YouTube), Google assigns unique identifiers to that session through third-party cookies including 3PSID, 3PAPISID, and 3PSIDCC. These cookies are set by Google services (such as google.com) and are explicitly tied to the user's logged-in Google account. The values of these cookies are unique to each account holder and persist across sessions and devices as long as the user remains signed in.

28. When creating a Google account, users are required to provide an email address, meaning that data collected alongside the 3PSID, 3PAPISID, and 3PSIDCC cookies (such as user communications on the BayCare Website) can be linked by Google to an identifiable email address. Many users also voluntarily provide additional identifying information to Google such as their full name, phone number, home address, work address, profile photograph, and recovery email— either during account creation or while using other Google services. As a result, Google can associate the data collected alongside the cookies not only with an email address, but also with a named and potentially highly personalized user profile. This enables Google to link a user's private activity on a website such as BayCare's to

their name and broader aspects of their digital identity, particularly when combined with other data collected across Google's ecosystem, such as Gmail usage, YouTube views, or Google Maps history.

29.    For users who are not signed into a Google account, Google sets a different type of cookie, known as the NID cookie. The NID cookie is tied to the user's browser rather than to a named account. It still contains a unique identifier that persists for approximately six months, unless a user manually "clears" their cookies (Google will then automatically generate a new, unique identifier associated with the NID cookie). The NID cookie enables Google to track user preferences, browsing behavior, and ad interactions across websites that use Google Analytics or serve Google Ads. While the NID cookie does not reveal a named account identity, it still allows Google to build behavioral profiles and serve personalized advertisements based on a user's activity, including activity on websites such as BayCare's. Google's Privacy Policy expressly acknowledges its practice of tracking users, even when they are not logged in, via sites that have installed the Google Analytics Tracker. Per Google's own statement: "[w]hen you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This allows us to do things like maintain your preferences across browsing sessions, such as your preferred

language or whether to show you more relevant search results or ads based on your activity."[1]

30.    Once Google intercepts and processes the raw user data about "events," which may include personal and sensitive health-related information, it uses the 3PSID, 3PAPISID, and 3PSIDCC cookies to associate this data with unique user identifiers, from which it can link website interactions to individual user profiles and track users across multiple different websites, sessions, and devices when signed into their Google accounts. After the data has been processed and subsequently stored in the Google database, Google uses the data to generate reports to help analyze the data intercepted. Those reports include reports on acquisition (e.g., information about where the traffic originated and the methods by which users arrived at a site), engagement (what web pages a user visited), and demographics (a user's age, location, language, gender, and interests expressed when browsing online and engaging in purchase activities).

31.    In addition to accessing and using the data intercepted from website users to provide its services, Google also uses the information intercepted by sites like BayCare to maintain and improve Google's own services, develop new

---

[1] *See* Google, *Privacy Policy*, https://policies.google.com/privacy/embedded?hl=en-US (last accessed July 29, 2025).

services, measure the effectiveness of its advertising, and personalize content and ads that one sees on Google's and its partners' sites and applications. When combined with Google's vast data resources from its other products and services, Google Analytics data can contribute to comprehensive profiles of individuals that can be used for targeting advertisements and other commercial purposes.

### iii.    The DoubleClick Tracking Technology

32.    DoubleClick is an advertising tracking tool that is owned by Google and is designed to collect information about user behavior on websites in order to improve the targeting and effectiveness of advertising campaigns. DoubleClick's tracking technologies (the "DoubleClick Tracker") automate the ad buying process and use collected data for targeted advertising initiatives. BayCare has implemented the DoubleClick Tracker on its Website.

33.    Like the Google Analytics Tracker, Website owners or administrators implement the DoubleClick Tracker by adding a snippet of JavaScript code to their website, typically in the header section of the site's code. This implementation process is usually simple, requiring the website administrator to copy and paste the provided code into the website's source code.

34.    Once implemented, the DoubleClick Tracker loads automatically and immediately whenever a user visits a page containing the Tracker's source code.

12

The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms and the interception of their communications by Google. The surreptitious nature of the Tracker means that users typically have no idea that their electronic communications are being intercepted by third parties like Google.

35.     Also like the Google Analytics Tracker, the DoubleClick Tracker can collect data on user interactions with a website and transmit these details to Google. These interactions may include page views, clicks, form submissions, video plays, and other custom-defined actions. While Google Analytics refers to these as "events," the DoubleClick Tracker generally tracks them as "conversions" or "activities," primarily for advertising and attribution purposes.

36.     Through the DoubleClick Tracker, Google creates and assigns unique identifiers to website visitors, including through the IDE and the DSID cookies. Each of the IDE and DSID cookies contains a string of numbers and letters. The IDE cookie is unique to each user's browser and is used to record user actions and measure ad effectiveness. For users signed into their Google accounts when accessing a website that includes the DoubleClick Tracker, the DSID cookie is

unique to that user's Google account and is used to identify signed-in users across Google services to deliver personalized advertisements. These identifiers can be associated with a user's browser or device over extended periods of time. (Collectively, the 3PSID, 3PAPISID, and 3PSIDCC cookies associated with the Google Analytics Tracker and the IDE and DSID cookies are referred to as the "Cookies"). The Cookies contain unique user identifiers that enable Google to connect user behavior across different websites, devices, and browsing sessions.

37.    The DoubleClick Tracker distinguishes itself from Google Analytics in that it specifically focuses on advertising functionality. It enables ad retargeting, which allows BayCare to display targeted advertisements to users on other websites based on their previous interactions with BayCare's Website. This means that sensitive health information intercepted by the DoubleClick Tracker could potentially influence the advertisements displayed to users across the internet, creating ongoing privacy concerns that extend well beyond the initial Website visit.

38.    The DoubleClick Tracker works in concert with Google's vast advertising network, which spans millions of websites. This means that the scope and impact of the interception facilitated by BayCare extends far beyond its own Website, potentially affecting users' experiences across the entire internet ecosystem. When combined with Google's other data sources, the information

intercepted through the DoubleClick Tracker enables even more precise identification and tracking of individuals.

39.    Upon information and belief, Google combines the sensitive health information intercepted through the DoubleClick Tracker with other data points in its possession (including data points obtained through the Google Analytics Tracker) to create comprehensive user profiles that include intimate details about individuals' medical conditions, treatment interests, and healthcare-seeking behaviors. These profiles can then be monetized through targeted advertising that may reveal or allude to users' private health concerns.

iv.    *Visitors to the Website Reasonably Expect Their Information to Stay Private*

40.    BayCare operates its Website as an extension of its healthcare services, facilitating patient care and providing healthcare information. The Website allows users and patients to search for physicians by name, specialty, location, and other criteria; schedule or request appointments with physicians; pay for medical services; obtain information about medical conditions and treatments; and search for various medical institutions and services.

41.    When using these online services, visitors input their medical information, including private and confidential information regarding their medical

conditions and treatment, with the reasonable expectation that such information will be kept confidential and used only for legitimate healthcare purposes.

42. Users of the Website reasonably expect that their communications and activities will remain private, particularly given BayCare's status as a healthcare provider subject to HIPAA and other privacy regulations, as well as professional and ethical obligations to protect patient confidentiality.

43. This expectation of privacy is reinforced by longstanding regulatory principles and enforcement actions in the healthcare sector. Federal privacy regulations have long recognized that protected health information extends beyond diagnosis-specific information. In 2013, HHS clarified through formal rulemaking that information need not contain specific medical terms to be protected under HIPAA: if it "is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity." 78 Fed. Reg. 5566, 5598 (January 25, 2013).

44. Baycare's conduct outlined herein is in violation of HIPAA, which imposes minimal penalties for knowingly disclosing individually identifiable health information ("IIHI") to third parties. 42 U.S.C. § 1320d-6(a)(3) defines IIHI as: "any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider . . . (B) relates to the past,

present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual."

45.     Through its conduct, BayCare intended to share and monetize its patients' IIHI, violating HIPAA and its common law duties.

46.     In 2023, the Federal Trade Commission warned healthcare providers about their obligations to protect against impermissible disclosures of personal health information through web-tracking technologies such as the Trackers discussed in this Complaint, emphasizing that unauthorized disclosure of such information through trackers can violate federal law.[2] Healthcare providers have been on notice that even seemingly innocuous data such as IP addresses, search queries for doctors, or visits to pages about specific health conditions can constitute sensitive health information when connected to an individual seeking healthcare services.

---

[2] Federal Trade Commission, *Re: Use of Online Tracking Technologies* (July 20, 2023): https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited July 29, 2025).

47.     This is particularly true for interactions that reveal an individual's interest in specific symptoms, health conditions, medical specialists, or appointment scheduling, regardless of whether such interactions occur on authenticated (password-protected) or unauthenticated portions of a healthcare provider's website, which are IIHI. The Trackers, as described above, personally identify individuals along with their protected health information instantaneously as they navigate the BayCare website and input their health information.

48.     This expectation of privacy is fundamental to the physician-patient relationship and extends to all healthcare communications, including those conducted through healthcare providers' websites.

49.     Users would not reasonably expect that simply by visiting BayCare's Website to search for doctors, schedule appointments, research medical conditions, or explore treatment options, their sensitive health information would be intercepted by third parties like Google for purposes unrelated to their healthcare needs.

*v.     Defendant's Implementation of the Trackers*

50.     BayCare has deliberately implemented the third-party Google Analytics Tracker and DoubleClick Tracker in the source code of its Website,

procuring Google to intercept sensitive health information and electronic communications of its patients and Website visitors without proper consent.

51.    The Tracker operates on pages of the Website where users search for medical specialists, research health conditions, locate treatment facilities, and schedule appointments. It operates invisibly to Website visitors, who have no meaningful way of knowing that their sensitive health queries and browsing behaviors are being intercepted by third parties.

52.    The information intercepted through these Trackers by Google includes but is not limited to Plaintiffs' and the Class Members': (1) doctor searches; (2) doctor profiles visited and the doctor's treatment specialties and location; (3) desired locations or facilities where treatment was sought; (4) pages visited related to specific treatment options (such as pages relating to symptoms, treatment options, or types of providers); (5) search terms entered into the website's general search bar; and (6) the pages viewed after clicking the search results (such as specific treatment specialties, doctors, or locations), alongside the search terms previously entered. When combined with persistent identifiers (the Cookies), this information allows Google to identify individual users and associate sensitive health information with their digital profiles.

53. The persistent identifiers used by the Trackers create digital fingerprints that allow Google to track individuals across multiple devices and browsing sessions, connecting their healthcare inquiries to broader online activities.

54. Upon information and belief, Google combines this intercepted healthcare-related data with information from its other services, creating comprehensive user profiles that include sensitive health information which can be used for targeted advertising and other commercial purposes.

55. As demonstrated in the following examples, BayCare procures the interception of sensitive personal health data without obtaining the consent required by the FSCA and ECPA.

vi. *Examples of Personal Data Collection and Disclosure on the BayCare Website*

56. *Physician Searches and Selection:* When a user visits the BayCare Website to search for a doctor or specialist, they can select options such as "Find a Doctor," prominently displayed at the top of the Website's homepage. Users can search for doctors and filter results based on criteria such as specialty, name, or location. A list of matching providers is then displayed, and users can access individual profile pages by clicking on a doctor's name. Unbeknownst to users, both the Google Analytics Tracker and DoubleClick Tracker automatically intercept and

transmit to Google information including the search terms entered, the name of providers views, alongside their medical specialty, and location. All these transmissions occur alongside the Cookies, allowing Google to associate search terms and the names, specialties and locations of doctors with the user's unique digital profile, creating a record of their medical concerns.

57.    The image below shows an example of search results when "diabetes" is entered into the "Find a Doctor" search bar.



58.    The marked-up image below shows that when the term "diabetes" is entered into the search bar, the user's entry of this search term on the BayCare

website is automatically transmitted to Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies.



59.    The image below is an example of what is shown if a user clicks to view the profile of Dr. Talal Faris from the search results. The page shows the doctor's name, his specialties ("Endocrinology, Diabetes and Metabolism") and his location in Hudson, Florida.



60.    The marked-up image below shows that when Dr. Faris's profile is viewed, the doctor's name ("Talal Faris, MD"), his location ("Hudson New Port Richey") and his specialty ("Endocrinology-Diabetes and Metabolism Internal Medicine") are automatically transmitted to Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies. Similar information is also transmitted by the DoubleClick Tracker.



61.    *Location Search:* The Website allows users to search for BayCare clinics by locations and service types, also allowing users to filter based on location, service, address, and more. Unbeknownst to users, both the Google Analytics Tracker and DoubleClick Tracker automatically intercept and transmit to Google information including the type of service the user views alongside the Cookies, allowing Google to associate locations and specialties with the user's unique digital profile, creating a record of their medical concerns.

62.    For example, when a user views the page showing locations of hospitals with surgery centers, the Google Analytics Tracker intercepts this communication, transmitting to Google the user's interest in "Surgery Centers." Furthermore, when they click on a specific facility like "Bardmoor Surgery Center,"

this information is transmitted to both Google Analytics and DoubleClick, alongside the Cookies. The marked-up image below shows the transmission to DoubleClick, including the IDE cookie, which is automatically transmitted when a user views the page for "Bardmoor Surgery Center":



63. *Specialties and Treatments:* The Website also allows users to browse the website through the category of "Specialties and Treatments at BayCare." The Google Analytics Tracker automatically intercepts and transmits to Google information including the type of service the user views alongside the Cookies, allowing Google to the medical services and treatments that the user is searching for alongside their unique digital profile, creating a record of their medical concerns.

64.    The marked-up image below shows that under the "Specialties & Treatments" heading, users can select to visit the "Cancer Institute" page:



65.    As shown in the marked-up image below, when a user visits this page, the user's visit to the "Cancer Institute" page and the user's visit to a page related to "specialties-and-treatments Cancer" is intercepted by the Google Analytics Tracker and automatically transmitted to Google, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies:



66.    Similarly, as shown in the marked-up image below, a user's visit to a page about BayCare's "Lung Cancer Screening Program" is also automatically intercepted by the Google Analytics Tracker and transmitted to Google, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies:



67. *Search Bar Entries*: Both the Google Analytics Tracker and DoubleClick Tracker intercept any information entered by a Website user into the Website's search bar, sending this information to Google alongside the Cookies, allowing Google to associate the user's searches on the site with their digital profile.

68. For example, as shown in the marked-up image below, when a user searches for "mammogram" in the Website's search bar, the fact that they entered this search term is intercepted by the Google Analytics Tracker and transmitted to Google alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies.



69. Further, as shown in the marked-up image below, if a user then clicks to view the "Hinks and Elain Shimberg Breast Center at St Joseph's Hospital North" location from the search results, the fact that the user views this page, and the fact that they had previously searched for "mammogram" is intercepted by the Google

Analytics Tracker and transmitted to Google alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies.



70.     Both Trackers transmit this search query to Google. When the user then selects a location for the mammogram, this location information is also transmitted to Google. In the case of Google Analytics, this is transmitted alongside the Cookies, allowing Google to associate the user's interest in mammogram screening with their digital profile.

71.     The above information, combined with the user's Cookies—particularly if the user was logged into their Google account or signed into Chrome while accessing the Website—allows Google to identify the person who has submitted this information through the Website.

*v.*     *Defendant's Responsibility for Google's Interception of Electronic Communications*

72.     Although the Trackers perform the technical functions of intercepting electronic communications, BayCare bears full legal responsibility for these actions under the FSCA and ECPA as the entity that has procured Google to intercept these communications.

73.     BayCare made the affirmative decision to implement the Trackers on its Website. This implementation was a deliberate action requiring Defendant's web administrators to copy the Trackers' tracking codes and insert them into the Website's source code. Without BayCare's deliberate implementation of this code, Google would have no access to the electronic communications of Defendant's Website's visitors.

74.     BayCare controls which pages of its Website contain the tracking code and could choose to exclude tracking from sensitive pages where healthcare information is accessed or inputted, yet it has chosen to implement tracking across these sensitive areas of its Website. Defendant maintains complete control over its Website and has the ability to remove or modify the Trackers at any time. Its continued use of these Trackers represents an ongoing choice to procure Google to intercept electronic communications from visitors to the Website.

75.    BayCare has procured Google's services to intercept electronic communications from its Website visitors and has arranged, aided, and abetted the interception of these communications by Google, where the data is then stored, analyzed, and potentially combined with other data in Google's possession.

76.    Defendant receives direct benefits from implementing these Trackers, including detailed analytics about Website usage that inform its business and marketing decisions. These benefits further establish BayCare's responsibility for procuring the interception practices that generate these analytics.

77.    These arrangements constitute a procurement of another person to intercept electronic communications without the consent of all parties to the communication, in direct violation of Chapter 934.03 of the FSCA and 18 U.S.C. § 2511 of the ECPA.

vi.    *Defendant's Failure to Obtain Consent for the Interception*

78.    BayCare fails to obtain consent from Website users before procuring the interception of their electronic communications by Google, in direct violation of Chapter 934.03 of the FSCA and 18 U.S.C. § 2511 of the ECPA.

79.    BayCare's Terms of Use and Privacy Policy are displayed only as small-font links at the bottom of the Website pages, buried among many other links.

31

Users are not required to manifest express assent to these policies and are not made aware of their existence during normal use of the Website.

80.     BayCare has never obtained valid consent from Plaintiffs or Class Members for the interception of their electronic communications by Google.

## PLAINTIFFS' EXPERIENCES

81.     Plaintiff Luis Angel Heredia Crespi used Defendant's Website on a semi-frequent basis for approximately three years and has used Defendant's Website within the last year. In particular, Plaintiff Crespi used Defendant's Website to seek physicians, specifically rheumatologists, to treat arthritis and other ailments. Plaintiff Crespi has a Google account and was logged into his Google account in his browser at all times while using the Website. On numerous occasions, Plaintiff Crespi accessed Defendant's Website on his phone for the purpose of finding and obtaining medical treatment for his specific medical conditions. Because Defendant utilized tracking tools on its Website, Google intercepted and received Plaintiff Crespi's sensitive medical information and electronic communications without his knowledge or consent. Shortly after using the Website, Plaintiff Crespi observed advertisements for products or services related to his medical conditions.

82.    Plaintiff Martin Forero has used Defendant's Website for years, and he most recently used it in March 2025 to seek out a general practitioner physician. Plaintiff Forero has a Google account and was logged into it in his browser at all times while using Defendant's Website. On numerous occasions, Plaintiff Forero accessed Defendant's Website on his phone for the purpose of finding and obtaining general medical treatment. Plaintiff Forero used the Website most recently to search for a general practitioner, but he has used it in the past for other ailments. Because Defendant utilized tracking tools on its Website, Google intercepted and received Plaintiff Forero's sensitive medical information and electronic communications without his knowledge or consent.

83.    Plaintiff Lynette Davis is a BayCare patient and has used Defendant's Website for more than ten years, most recently in May 2025. She has used it to search for locations, search for primary care physicians, and to schedule appointments. During her use of the Website, she has disclosed her particular medical conditions and symptoms. Plaintiff Davis has had a Google Account for over ten years, and she had her Google Account at all times and was logged into it in her browser while using Defendant's Website. On numerous occasions, Plaintiff Davis accessed Defendant's Website on her phone for the purpose of finding and obtaining medical treatment from Defendant.

84.    At no time did any Plaintiff consent to the interception of their sensitive medical information and electronic communications with Defendant through the Website by Google or to Defendant enabling Google to access or intercept such information. Each Plaintiff reasonably expected that their online communications with Defendant were solely between themselves and Defendant and that such communications would not be transmitted to or disclosed to Google.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

85.    BayCare's procurement of unauthorized interception of Website user communications has caused actual harm to Plaintiffs and Class Members in multiple ways.

86.    *Invasion of Privacy:* Medical and health-related information about individuals is highly private, and its interception can result in significant embarrassment, stigma, and even discrimination. Plaintiffs and Class Members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and healthcare-related activities. The interception of these communications violated Plaintiffs' and Class Members' reasonable expectation that their interactions with a healthcare provider would remain private.

87.     *Loss of Data Value*: Plaintiffs and Class Members have been deprived of the economic value of their personal data. In today's digital economy, personal data—especially health-related information—has significant commercial value.

88.     In a 2014 article by the Federal Trade Commission, the agency detailed the value of user data, particularly health information, and found that data brokers sell data in sensitive categories for a premium.[3] The FTC subsequently brought a lawsuit against one of the data brokers for selling location data regarding people who visit abortion clinics for approximately $160 for a week's worth of data.[4]

89.     For years, data harvesting has been one of the fastest growing industries in the United States. Conservative estimates suggest that internet companies earn hundreds of dollars per American user through the interception and use of personal data.

90.     The value of health data is well-known and has been reported on extensively in the news. For example, a 2017 article by Time Magazine titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" described the

---

[3] Federal Trade Commission, *Data Brokers, A Call For Transparency And Accountability* (May 2014), https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf (last visited July 29, 2025).

[4] *See* Federal Trade Commission, *FTC Sues Kochava for Selling Data that Tracks People at Reproductive Health Clinics, Places of Worship, and Other Sensitive Locations* (Aug. 29, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other (last visited July 29, 2025).

35

extensive market for health data and noted that the market for information was both lucrative and a significant risk to privacy.[5]

91.    Due to the difficulty in obtaining health information, illegal markets also exist for such personal and sensitive information.  NPR reported that health data can be "more expensive than stolen credit card numbers."[6]

92.    Plaintiffs' and Class Members' private and personal data, including their protected health information, have a recognized monetary value.  BayCare's procurement of unauthorized interception by Google of this sensitive personal data has deprived Plaintiffs and Class Members of the economic value of their personal property without proper consideration and has resulted in BayCare unjustly enriching itself at the expense of Plaintiffs and Class Members.

93.    *Chilling Effect on Healthcare Communication:*  BayCare's conduct has undermined patient trust and created a chilling effect on digital healthcare communications. Plaintiffs and Class Members can no longer confidently use the Website to seek medical information, locate healthcare providers, research

---

[5] *See* Adam Turner, Time, "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," https://time.com/4588104/medical-data-industry/ (last visited July 29, 2025).
[6] Aarti Shahani, NPR, *The Black Market For Stolen Health Care Data*, (Feb. 13, 2015, 4:55 am), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-forstolen-health-care-data (last visited July 29, 2025).

treatments, or manage their healthcare without fear that their activities are being intercepted by third parties.

94. *Risk of Further Use of Intercepted Data:* Once intercepted by Google, Plaintiffs' and Class Members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future harm. For example, Google may combine the health-related data it intercepts from BayCare's Website with data from its other services (such as Google Search, YouTube, or Gmail) to create detailed user profiles that include sensitive health information.

95. *Statutory Injury:* Independent of the above harms, BayCare's violation of the FSCA and ECPA has caused Plaintiffs and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## CLASS ACTION ALLEGATIONS

96. Plaintiffs bring this action on behalf of themselves individually and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

97. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

All individuals residing in the United States whose electronic communications were intercepted through BayCare's Website by Google within the applicable statute of limitations period (the "Nationwide Class").

98. Plaintiffs also seek to represent the following state subclass:

All individuals residing in Florida whose electronic communications were intercepted through BayCare's Website by Google within the applicable statute of limitations period (the "Florida Class")

99. The Nationwide Class and Florida Class are collectively referred to as the "Class."

100. Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) Google, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members, and staff; and (e) any jurors assigned to this case.

101. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

102.   *Numerosity*: The Class is so numerous that joinder of all members is impracticable. BayCare is one of the largest healthcare systems in Florida with more than 30,000 employees, 16 hospitals, and hundreds of outpatient locations. Upon information and belief, the Website receives hundreds of thousands of unique visitors each year, many of whom had their electronic communications intercepted by Google during the relevant time period.

103.   *Commonality and Predominance*: There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a)   Whether BayCare implemented the Trackers on its Website;

(b)   Whether the Trackers intercepted Website users' electronic communications;

(c)   Whether BayCare procured, enabled, and aided and abetted the interception of Website users' electronic communications;

(d)   Whether BayCare obtained Website users' consent to procure the interception of their electronic communications;

(e)   Whether BayCare's conduct violated Chapter 934.03 of the FSCA;

(f)   Whether BayCare's conduct violated 18 U.S.C. § 2511 of the ECPA;

(g)   Whether BayCare's procurement of interception of Website users' electronic communications constitutes an invasion of privacy;

(h)   Whether BayCare has been unjustly enriched through its conduct;

(i)   Whether Plaintiffs and Class Members are entitled to damages and other monetary relief, and if so, in what amount; .

(j)   Whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to injunctive relief.

104.   *Typicality:* Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and Class Members all visited BayCare's Website and had their electronic communications intercepted by Google without their consent. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members and are based on the same legal theories.

105.   *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel experienced in complex class action

litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

106.  *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications. A class action provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

107.  *Injunctive Relief Appropriate*: BayCare has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

## COUNT I: VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT (Fla. Stat. § 934.03)
### (On Behalf of Plaintiffs and the Florida Class)

Plaintiffs incorporate the above paragraphs by reference and further say—

108.   The FSCA, § 934.03, prohibits the intentional interception, endeavor to intercept, or procurement of any person to intercept or endeavor to intercept any wire, oral, or electronic communication without the consent of all parties to the communication.

109.   The FSCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." § 934.02(12).

110.   The FSCA further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." § 934.02(3).

111.   The FSCA defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, electronic, or oral communication" other than equipment furnished to the subscriber or user by a provider in the ordinary course of its business. § 934.02(4).

112.   The Google Analytics Tracker and the DoubleClick Tracker implemented by BayCare in its Website source code each constitute an "electronic, mechanical, or other device" under the FSCA because (a) Each is a JavaScript code

42

specifically designed to intercept and acquire the contents of electronic communications between Website visitors and BayCare; (b) Each captures the content and substance of these communications in real-time, contemporaneously with their transmission; (c) Each functions to acquire data about user interactions, including sensitive health information, searches for medical specialists, treatment inquiries, and other protected healthcare communications; and (d) They were not furnished to Website visitors by a provider of wire or electronic communication service in the ordinary course of its business, nor are they equipment being used by BayCare in the ordinary course of its business as a healthcare provider.

113.    The internet communications between Plaintiff, Class Members, and BayCare's Website constitute "electronic communications" as defined by the FSCA, as they are transfers of signs, signals, writing, images, sounds, data, or intelligence transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system.

114.    Plaintiffs and other Class Members had a reasonable expectation of privacy in the electronic communications they had with BayCare's Website. But their electronic communications were transmitted to and intercepted by Google during the communication and without knowledge, authorization, or consent of Plaintiffs and Class Members. This occurred because Defendant intentionally

inserted electronic devices into its Website that, without the knowledge and consent of Plaintiffs and Class Members, recorded and transmitted the substance of their confidential communications to unauthorized parties.

115. BayCare, through its implementation of the Trackers on its Website, has intentionally procured, aided and abetted, and conspired with Google to intercept the electronic communications of Plaintiffs and Class Members as they browse the Website.

116. The interception of these communications occurs in real time, contemporaneously with their transmission. When Plaintiffs and Class Members interact with the Website, the Trackers immediately intercept these electronic communications and transmit them to Google's servers in real-time.

117. The interception of these communications was done without the consent of Plaintiffs and Class Members. BayCare did not obtain proper consent from Website visitors before implementing the Tracker that would intercept their communications.

118. As a direct result of BayCare's violations, Plaintiffs and Class Members are entitled to recover damages of $1,000 or $100 for each day of violation, whichever is higher, together with reasonable attorneys' fees and costs, as provided by Chapter 934.10 of the FSCA.

119.    Plaintiffs and Class Members are also entitled to injunctive relief to prevent BayCare from continuing to implement trackers that intercept their electronic communications without proper consent.

## COUNT II: VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT (18 U.S.C. § 2511 *et seq*.)
### (On Behalf of Plaintiffs and the Nationwide Class)

Plaintiffs incorporate the above paragraphs by reference and further say—

120.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of electronic communications, and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

121.    The ECPA protects both the sending and receipt of communications and provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

122.    The transmissions between Plaintiffs and Class Members and BayCare's Website are "transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate

commerce" and therefore constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

123. The ECPA defines "content" to "include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The health information intercepted here, including physician searches, medical conditions, appointment requests, and treatment inquiries, constitutes content under the ECPA.

124. The Trackers implemented by BayCare constitute "electronic, mechanical, or other devices" within the meaning of 18 U.S.C. § 2510(5) because they are specifically designed to intercept and acquire the contents of electronic communications between Website visitors and BayCare.

125. The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The Trackers acquire the contents of users' communications in real-time, contemporaneously with their transmission.

126. By deliberately implementing the tracking codes of Google Analytics and DoubleClick on its Website, BayCare procured Google to intercept its visitors' electronic communications. Specifically: (a) BayCare made the affirmative decision

to embed each Tracker's code into its Website; (b) BayCare's implementation of these codes was the necessary predicate act that enabled Google to intercept users' communications; without BayCare's actions, Google would have no access to the communications; (c) BayCare controls which pages contain the tracking codes and could have excluded them from sensitive areas where health information is transmitted, but chose not to; (d) BayCare maintains ongoing relationships with Google and continues to facilitate its interception of user communications; (e) BayCare receives benefits from this arrangement, including analytics data and advertising capabilities, creating a quid pro quo relationship.

127.    Through this procurement, BayCare caused Google to intercept, in real-time, the electronic communications of users containing sensitive health information, in violation of 18 U.S.C. § 2511(1)(a).

128.    By intentionally using or endeavoring to use the contents of these intercepted communications, knowing or having reason to know the information was obtained through illegal interception, BayCare violated 18 U.S.C. § 2511(1)(d).

129.    Plaintiffs and Class Members had a reasonable expectation that their communications with a healthcare provider's website would remain confidential and would not be intercepted by third parties that BayCare had procured for commercial purposes.

130.    Users did not consent to BayCare's procurement of third-party interception and sharing of their health information for advertising and analytics purposes.

131.    BayCare was not acting under the color of law when procuring these interceptions, and no other exception to ECPA liability applies.

132.    As a direct result of BayCare's violations, Plaintiffs and Class Members are entitled to: (a) actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

## COUNT III: BREACH OF CONFIDENCE
### (On Behalf of Plaintiffs and the Nationwide Class)

Plaintiffs incorporate the above paragraphs by reference and further say—

133.    Medical providers have a duty to their patients to keep non-public medical information completely confidential.

134.    Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with BayCare, including communications exchanged on BayCare's Website.

135. Contrary to its duties as a medical provider, BayCare installed Trackers to disclose and transmit Plaintiffs' and Class Members' communications, including private health information, to Google.

136. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

137. As a direct and proximate cause of BayCare's unauthorized disclosures, Plaintiffs and Class Members were damaged, including but not limited to: invasion of privacy, loss of the value of their sensitive medical information information, loss of the benefit of their bargain with BayCare, and erosion of the essential confidential nature of the provider-patient relationship.

## COUNT IV: INVASION OF PRIVACY—INTRUSION UPON SECLUSION
### (On Behalf of Plaintiffs and the Nationwide Class)

Plaintiffs incorporate the above paragraphs by reference and further say—

138. Florida recognizes the common law tort of invasion of privacy, including the form known as intrusion upon seclusion, which protects against intrusion upon the plaintiff's seclusion or solitude, or into his or her private affairs.

139. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with BayCare regarding their healthcare needs, medical conditions, and treatment preferences.

140. BayCare intentionally intruded upon the seclusion and private affairs of Plaintiffs and Class Members by implementing the Trackers on its Website that procured the interception of sensitive, personal health information without proper authorization or consent.

141. BayCare's intrusion upon Plaintiffs' and Class Members' private communications would be highly offensive to a reasonable person. Internet users have a reasonable expectation that their personally identifiable communications with healthcare providers' websites will remain private, particularly when those communications involve sensitive health-related matters.

142. BayCare's intrusion was intentional, as it deliberately implemented the Trackers on its Website to capture user communications for its own business purposes.

143. As a direct and proximate result of BayCare's invasion of their privacy, Plaintiffs and Class Members have suffered injury, including loss of their reasonable expectation of privacy and diminution in the value of their personal information.

144. Plaintiffs and Class Members are entitled to damages, including compensatory and punitive damages, in an amount to be determined at trial.

## COUNT V: UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

Plaintiffs incorporate the above paragraphs by reference and further say—

145.   BayCare has received a benefit from Plaintiffs and Class Members through the interception of their valuable personal data via the Trackers.

146.   By implementing the Trackers on its Website, BayCare has been able to procure the interception of users' electronic communications by Google for business purposes, including marketing and advertising analytics, thereby enriching itself at the expense of Plaintiffs and Class Members.

147.   BayCare has retained this benefit under circumstances which make it inequitable to do so without payment of its value to Plaintiffs and Class Members.

148.   It would be unjust and inequitable to allow BayCare to retain the benefits of its unlawful conduct.

149.   Plaintiffs and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by BayCare through its wrongful conduct.

## COUNT VI: BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Nationwide Class)

Plaintiffs incorporate the above paragraphs by reference and further say—

150. When Plaintiffs and Class Members provided their sensitive medical information to BayCare through its Website, they entered into implied contracts pursuant to which BayCare agreed to safeguard and not disclose their sensitive medical information without consent.

151. Plaintiffs and Class Members would not have entrusted BayCare with their sensitive medical information in the absence of an implied contract obligating BayCare to not disclose sensitive medical information without their consent.

152. BayCare breached these implied contracts by disclosing Plaintiffs' and Class Members' sensitive medical information to Google without authorization.

153. As a direct and proximate result of BayCare's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other Class Members similarly situated, respectfully request that this Court:

(a)   Certify this case as a class action on behalf of the proposed Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that BayCare's actions, as described herein, violate the Florida Security of Communications Act and the Electronic Communications Privacy Act;

(c) Award Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiffs and the Class statutory damages as provided by the FSCA and ECPA;

(e) Award Plaintiffs and the Class punitive damages;

(f) Award Plaintiffs and the Class restitution and disgorgement of all profits, benefits, and other compensation obtained by BayCare from its wrongful conduct;

(g) Award injunctive relief requiring BayCare to cease procuring the interception of Website users' communications without proper consent; destroy all user data intercepted through the Trackers; and implement appropriate safeguards to ensure the protection of Website users' privacy in the future;

(h)   Award Plaintiffs and the Class pre-judgment and post-judgment interest;

(i)   Award Plaintiffs and the Class reasonable attorneys' fees and costs, as allowed by law; and

(j)   Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Respectfully submitted,

Dated: August 22, 2025

s/Daniel I. Schlade
Daniel I. Schlade – Lead Counsel
(Bar No. 1034991)
James M. Dore (*pro hac vice* forthcoming)
Counsel for Plaintiffs
6232 N. Pulaski, #300
Chicago, IL 60646
danschlade@gmail.com
773-550-3775

**DON BIVENS PLLC**
Don Bivens (*pro hac vice* forthcoming)
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 762-2661
don@donbivens.com